In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE FOR PROPOSED INITIATIVES 2001–2002 # 21 AND # 22 ("ENGLISH LANGUAGE EDUCATION"),

**Jorge L. Garcia, Sheila M. Shannon, and Beverly Ausfahl, Objectors, Petitioners,**

v.

**Rita Montero and Jeanine Chavez, Proponents, Respondents.**

**and**

**William A. Hobbs, Alan J. Gilbert, and Charles W. Pike, Title Board.**

**Nos. 01SA409, 01SA410.**

Supreme Court of Colorado, En Banc.

April 8, 2002.

Isaacson, Rosenbaum, Woods & Levy, P.C., Edward T. Ramey, Denver, Colorado, Lorenzo A. Trujillo, Westminster, Colorado, Attorneys for Petitioners.

Hall & Evans, L.L.C., Alan Epstein, Beth Dickhaus, Denver, Colorado, Attorneys for Respondents.

Ken Salazar, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Denver, Colorado, Attorneys for Title Board.

Justice KOURLIS delivered the Opinion of the Court.

These consolidated ballot title review proceedings involve two proposed constitutional

initiatives, both concerning English language education in public schools. The proponents and objectors are the same in both proceedings. The objectors, Jorge L. Garcia, Sheila M. Shannon, and Beverly Ausfahl, are registered electors, and they brought these original proceedings pursuant to section 1–40–107(2), 1 C.R.S. (2001), to review the actions taken by the initiative title setting board in fixing the title, ballot title and submission clause ("titles")[1] for Initiatives 2000–2001 # 21 and 2000–2001 # 22 ("Initiatives # 21 and # 22").[2] Both initiatives would amend article IX of the Colorado Constitution to add a new section 18.

On December 5, 2001, the title board held a public hearing pursuant to section 1–40–106(1), 1 C.R.S. (2001), and set the titles for Initiatives # 21 and # 22. The objectors filed motions for rehearing on December 12, 2001. The title board heard the motions on December 19, 2001 and denied the motions for rehearing.

The objectors assert that both initiatives contain multiple subjects in violation of Colo. Const. art. V, § 1(5.5) and section 1–40–106.5, 1 C.R.S. (2001). In addition, according to the objectors, the titles of both initiatives are misleading because (1) they do not clearly express the creation of a new constitutional duty on the part of the state to provide all children with an education to become productive members of the society; (2) they do not fairly express the intent of the initiatives to eliminate bilingual education altogether; (3) they are unfair in that they do not clearly express the true meaning of the initiatives by first referencing a parental waiver process and then eviscerating that process; and (4) the titles do not fairly express the initiatives' true intent to remove English-language instruction from local to state control.

We conclude that neither of the initiatives contain more than one subject, but that the titles are indeed misleading and confusing. We return the initiatives to the title board

for the fixing of new titles, and specifically direct the board to formulate titles that are truly clear, concise, and understandable.

## I. Single–Subject Requirement

### A.

■■■ The objectors assert that the title board should not have set the titles because both initiatives contain multiple subjects, and therefore violate article V, section 1(5.5) of the Colorado Constitution, which states:

> No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any measure which shall not be expressed in the title, such measure shall be void only as to so much thereof as shall not be so expressed. If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls.

Colo. Const. art. V, § 1(5.5); *see also* § 1–40–106.5, 1 C.R.S. (2001) (addressing the constitutional single-subject requirement). A proposed initiative violates this requirement when it "relate[s] to more than one subject and ... [has] at least two distinct and separate purposes which are not dependent upon or connected with each other." *In re Proposed Initiative "Public Rights In Waters II"*, 898 P.2d 1076, 1078–79 (Colo.1995). On the other hand, a proposed measure that "tends to effect or to carry out one general objective or purpose presents only one subject." *In re Ballot Title 1999–2000 # 25*, 974 P.2d 458, 463 (Colo.1999). We conclude that the proposed measures in this case contain the same single subject, which is teaching the English language in public schools by teaching academic subjects in English.

■■■ We have only a limited role in ballot-title proceedings. In general, we will not interpret or construe the future legal effects

---

**1.** Effective August 2, 2000, the general assembly deleted the previous requirement that the title board, in addition to the titles, set a summary of the proposed initiative (including a fiscal impact statement). *See* ch. 339, sec. 1, § 1–40–106(3)(a), 2000 Colo. Sess. Laws, 1620, 1620. The title board's titles for proposed Initiatives

# 21 and # 22 are attached as Appendices B and D, respectively.

**2.** The texts of proposed Initiatives # 21 and # 22 are attached as Appendices A and C, respectively.

of a proposed initiative. *In re Ballot Title 1999–2000 # 200A*, 992 P.2d 27, 30 (Colo. 2000). In certain circumstances, however, we will engage in a limited inquiry if necessary to ascertain whether the single-subject requirement has been violated. *In re Ballot Title 1999–2000 ##172–175*, 987 P.2d 243, 244 (Colo.1999). The objectors claim that Initiative # 21 has four separate subjects, and that Initiative # 22—which is identical to # 21 except for the addition of a community-based tutoring program—has five. All of the parties agree that English-language acquisition by teaching in English is the primary subject of the initiatives. Initiatives # 21 & # 22, subsec. (3). The proponents and title board consider this the only subject. The objectors claim, however, that the initiatives contain a number of other subjects, specifically:

(1) They establish a new constitutional duty on the part of the state government and public schools to provide all of the children in the state, on an ethnically neutral basis, with a "public school education necessary to become productive members of our society," *id.*, subsec. (1)(c), "at their public school of choice," *id.*, subsec. (5).

(2) The initiatives create a new restriction on an individual's eligibility to hold "any position of authority anywhere within Colorado government or the public school system." *Id.*

(3) Both initiatives establish a new restriction on the indemnification rights of school district employees and school board members. *Id.*

(4) Initiative # 22 mandates the creation of subsidized programs of English-language instruction for adults who pledge to tutor children who are not fluent in English. Initiative # 22, subsec. (7).

In the last cycle of initiatives, we reviewed a similar measure involving English language education. *See In re Ballot Title 1999–2000 # 258(A)*, 4 P.3d 1094 (Colo.2000). We concluded that the proposed initiative did not violate the single-subject requirement, but that the titles were misleading because they failed to summarize the provision that no school district or school could be required to offer bilingual education, *id.* at 1099, and contained an improper catch phrase, *id.* at 1100. Although the present proposed initiatives are similar to # 258(A), they differ in a number of key areas, and thus require us to engage in a new single-subject analysis.

### B. Analysis

#### (1) New Constitutional Duty

According to the objectors, the initiatives contain an additional subject in the form of a new constitutional duty on the part of the government and public schools to provide all Colorado children with a public school education to become productive members of society, Initiatives # 21 & # 22, subsec. (1)(c),[3] and with an English-language public education at their public school of choice. *Id.*, subsec. (5).[4] Objectors point to *Lujan v. Colorado State Board Of Education*, 649 P.2d 1005, 1017 (Colo.1982), for the proposition that the state constitution "does not establish education as a fundamental right."

In ballot-title proceedings, in determining whether the title board has expressed the true intent and meaning of the proposal, we have considered testimony from the proponents. In *In re Proposed Amendment Concerning Unsafe Workplace Environment*, 830 P.2d 1031, 1034 (Colo.1992), we stated, "The proponent of the measure best understands the reasons for initiating the change or addition to the constitution or statutes. Furthermore, the statute requires public meetings for the fixing of such descriptions. If testimony from such meeting could not be considered by the Board, the requirement of a

---

**3.** Subsection (1)(c) provides, in pertinent part:

The government and the public schools of Colorado have a moral obligation and a constitutional duty to provide all of Colorado's children, regardless of their ethnicity or national origins, with an available public school education necessary to become productive members of our society.

**4.** Subsection (5) reads, in relevant part:

As detailed in subsections (3) and (4) of this section, all Colorado children have the right to be provided at their public school of choice with an English language education.

public meeting would be meaningless." (Citation omitted.) At the December 5, 2001, public hearing, the proponents disclaimed any intent to create a *new* constitutional duty for the education of Colorado children above what exists at present—except of course for the right of children to learn English by being taught in English, as the proponents indicated at the rehearing.

In their answer brief, the proponents claim that the initiatives create no new constitutional duty to provide children generally with a public education, but merely recognize what the constitution already provides in article IX, § 2:

> **Section 2. Establishment and maintenance of public schools.** The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously. One or more public schools shall be maintained in each school district within the state, at least three months in each year; any school district failing to have such school shall not be entitled to receive any portion of the school fund for that year.

Colo. Const. art. IX, § 2. For purposes of this proceeding, we will accept the testimony of the proponents regarding a general duty to educate, and the subsequent actions of the title board in setting the titles, apparently with this understanding. Moreover, we do not construe subsection (5) as creating a new constitutional right for a child to attend the school of his or her choice.

The pertinent part of subsection (5) states: "*As detailed in subsections (3) and (4) of this section,* all Colorado children have the right to be provided at their public school of choice with an English language education."

(Emphasis added.) The right of Colorado children to an education at the school of their choice is therefore limited as provided in subsections (3) and (4). Subsection (3) does not give the students any choice, but subsection (4), detailing the parental-waiver process, allows, under limited circumstances, for a child with such a waiver to transfer to a school in which a bilingual, or quasi-bilingual, class is offered. This is the extent of "choice" under the proposed initiative. As such, we conclude that any "constitutional duty" is not a second subject.[5]

Our decision today does not conflict with *Lujan,* which concluded, for purposes of equal-protection analysis, that education was not a *fundamental* constitutional right triggering strict scrutiny. *Lujan,* 649 P.2d at 1018. *Lujan* did not hold that Colo. Const. art. IX, § 2 created *no* constitutional right to an education; in fact, the case stated that article IX, § 2 "mandates the General Assembly to provide to each school age child the opportunity to receive a free education, and to establish guidelines for a thorough and uniform system of public schools." *Id.* at 1018–19.

**(2) Restrictions on Holding Public Office**

Subsection (5) of the initiatives mandates that:

> Any school district employee or school board member who willfully and repeatedly refuses to implement the terms of this section may be held personally liable for attorney fees and actual and compensatory damages by the child's parents or legal guardian, and cannot be subsequently indemnified for such assessed damages by any public or private third party. *Any party found so liable in a court of law shall be immediately removed from office for malfeasance, and shall be barred from holding any position of authority any-*

---

5. We note that subsections (1)(c) and (5), like much of the proposed initiatives, are taken almost verbatim from California's Proposition 227, which requires California school children to be taught English by being taught academic subjects in English. *See* Cal. Educ.Code §§ 300–340 (West Supp.2002); *see generally* Catherine P. Johnson, Note, *The California Backlash Against Bilingual Education: Valeria G. v. Wilson and*

*Proposition 227,* 34 U.S.F.L.Rev. 169 (1999). Moreover, Arizona's Proposition 203, which was approved by the electorate in November 2000, was derived from Proposition 227. *See* Ariz.Rev. Stat. Ann. §§ 15–751 to –755 (West Supp.2001). In fact it contains a couple of provisions that are not in Proposition 227, but are in Initiatives # 21 and # 22.

*where within the Colorado government or the public school system for a subsequent period of five years.*

(Emphasis added.) [6] The objectors assert that this provision creates a new issue-specific qualification upon eligibility to hold public office in Colorado. We do not agree with that characterization. Only school employees or board members who are found in a court of law to have "willfully and repeatedly refuse[d] to implement the terms of this" proposed constitutional amendment are barred from holding public office.

As the title board notes, this provision is part of the measures' enforcement mechanism. It does not establish penalties for any violation not directly related to the measures themselves. In *In re Ballot Title 1999–2000 # 255*, 4 P.3d 485, 495 (Colo.2000), we held that a provision that imposed penalties for violations of the measure itself was not a separate subject from the implementation of background checks at gun shows, the subject of the measure. Similarly, removal from office and imposition of disability to hold public office for a period of five years is not a separate subject.

The objectors also allege that subsection (5) is an effort to amend articles IV (executive department), V (legislative department), VI (judicial department), and XII (officers), without explicitly amending those articles. However,

the mere fact that a constitutional amendment may affect the powers exercised by government under pre-existing constitutional provisions does not, taken alone, demonstrate that a proposal embraces more than one subject. All proposed constitutional amendments or laws would have

the effect of changing the status quo in some respect if adopted by the voters.

*In re Ballot Title 1999–2000 # 258(A)*, 4 P.3d at 1098 (concluding that the previous proposed initiative for English language education in public schools did not contain multiple subjects). We agree with the title board that this provision is not a separate subject.

### (3) Indemnification

Subsection (5) also contains an anti-indemnification clause:

Any school district employee or school board member who willfully and repeatedly refuses to implement the terms of this section may be held personally liable for attorney fees and actual and compensatory damages by the child's parents or legal guardian, and *cannot be subsequently indemnified for such assessed damages by any public or private third party.*

(Emphasis added.) [7] The objectors claim that this is an issue-specific constitutional override of section 24–10–110, 7 C.R.S. (2001), which provides, in general, that a public entity shall pay all judgments and settlements of claims, as well as attorney's fees, made against any of its employees arising out of injuries sustained from an act or omission of the employee acting within the scope of his or her employment. § 24–10–110(1)(b), –110(1.5), 7 C.R.S. (2001).[8] The anti-indemnification provision is not itself a separate subject for the same reasons that future restrictions on the holding of public office following a trial in a court of law is not a separate subject.

These three topics are the only single-subject challenges to Initiative # 21. We

---

**6.** Proposition 227 contains no such provision. *See* Cal. Educ.Code § 320 (West 2002) (from which some of subsection (5) is derived). Proposition 203 does, however. *See* Ariz.Rev.Stat. Ann. § 15–754.

**7.** Proposition 227 does not contain an express anti-indemnification provision. It states that an individual who "willfully and repeatedly refuses to implement the terms of this statute by providing such an English language educational option at an available public school to a California school child may be held personally liable for fees and actual damages by the child's parents or legal guardian." Cal. Educ.Code § 320. On the

other hand, Proposition 203 does contain an anti-indemnification provision. *See* Ariz. Stat. Ann. § 15–754.

**8.** This claim is not free from doubt, however. Sections 24–10–110(1)(b) and –110(1.5)(a) exempt the public entity from paying the judgment against, and the attorney's fees incurred in defending, an employee who engages in willful and wanton conduct. For purposes of single-subject analysis, we assume that subsection (5)'s anti-indemnification provision modifies section 24–10–110.

therefore conclude that Initiative # 21 does not violate the single-subject requirement.

#### (4) Subsidized Adult Tutoring Programs

Subsection (7) of Initiative # 22 provides for subsidized programs of English-language instruction for adults who pledge to tutor children who are not fluent in English. Initiative # 22, subsec. (7).[9] Subsection (7) provides in part:

#### (7) **Community-based English tutoring.**

In furtherance of its constitutional and legal requirement to offer special language assistance to children who are English learners and effectively implement this section, the state shall encourage family members and others to provide personal English language tutoring to such children, and support these efforts by raising the general level of English language knowledge in the community. Commencing with the fiscal year in which this section is enacted and for each of the nine fiscal years following thereafter, a sum of five million dollars ($5,000,000) per year is hereby appropriated from the General Fund *for the purpose of providing additional funding for free or subsidized programs of adult English language instruction to parents or other members of the community who pledge to provide personal English language tutoring to Colorado school children who are English learners.*

(Emphasis added.)

Although they acknowledge that this clause "arguably bears the closest connection to the primary subject of the initiative," the objectors flatly assert, with no argument, that it is a separate subject. We disagree. Establishing programs for family members and other adults to receive English-language instruction if they pledge to tutor English learners, the children at the core of this initiative, is directly related to the subject of the initiative. Accordingly, Initiative # 22 does not violate the single-subject requirement.

**9.** Proposition 227 contains a similar provision. *See* Cal. Educ.Code § 315 (West 2002); Proposi-

## II. Titles

### A.

■ The objectors allege that the titles of both initiatives are misleading and do not correctly and fairly express the initiatives' true intent and meaning. We agree. Section 1–40–106(3)(b), 1 C.R.S. (2001) provides:

(b) In setting a title, the title board shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a "yes" or "no" vote will be unclear. *The title for the proposed law or constitutional amendment, which shall correctly and fairly express the true intent and meaning thereof,* together with the ballot title and submission clause, shall be completed within two weeks after the first meeting of the title board. . . . *Ballot titles shall be brief,* shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered "yes" (to vote in favor of the proposed law or constitutional amendment) or "no" (to vote against the proposed law or constitutional amendment) and which shall unambiguously state the principle of the provision sought to be added, amended, or repealed.

(Emphasis added.) "In reviewing the actions of the Board, we grant 'great deference to the board's broad discretion in the exercise of its drafting authority.' *In re Proposed Initiative Concerning 'State Personnel Sys.',* 691 P.2d 1121, 1125 (Colo.1984)." *In re Proposed Ballot Initiative on Parental Rights,* 913 P.2d 1127, 1131 (Colo.1996). However, we analyze the title in light of the board's statutory responsibilities as well as the import of the proposal.

■ The objectors assert that the titles are misleading in the following ways: (1) they do not clearly express the creation of a new constitutional duty on the part of the state to provide all children with an education to become productive members of the society; (2) they do not fairly express the intent of the initiatives to eliminate bilingual

tion 203 does not.

education altogether; (3) they are unfair in that they do not clearly express the true meaning of the initiatives by referencing a parental waiver process and then eviscerating that process; and (4) the titles do not fairly express the initiatives' true intent to remove English-language acquisition from local to state control.

### B.  Analysis

#### (1)  New Constitutional Duty

The objectors claim that the titles nowhere express that the initiatives create a broad, new constitutional duty on the part of the state to educate children.  But we rejected that very proposition in section I(B)(1) above. It is not misleading for the titles to fail to mention a new constitutional duty that does not exist.

#### (2)  Elimination of Bilingual Education

The objectors claim that, like in proposed initiative # 258(A) from the last cycle, the titles in this case are misleading because they do not disclose that adoption of the initiatives will effectively eliminate bilingual programs altogether.  In *In re Ballot Title 1999–2000 # 258(A)*, 4 P.3d at 1099, we held that the titles for the proposed measure were misleading because they "do not state, paraphrase, or summarize the initiative's provision that 'no school or school district shall be required to offer a bilingual education program.' " The current initiatives remedy the problem by omitting that provision.  In fact, the initiatives purport to require some form of bilingual or quasi-bilingual programs where twenty or more students in the same grade obtain a parental waiver.  Subsection (4)(a) of the initiatives provides, in part:

> If a parental waiver has been granted, the affected child may be transferred to classes teaching English and other subjects through bilingual education techniques or other generally recognized educational methodologies permitted by law. *Individual schools in which twenty students or more of a given grade level receive a waiver shall be required to offer such a class; in all other cases, such students shall be permitted to transfer to a public school in which such class is of-*

> *fered, with the costs of such transfer, excluding transportation, to be provided by the state.*

(Emphasis added.)  Hence, the proposal does preserve bilingual education in very limited circumstances; however, the availability of such bilingual education hinges entirely on the waiver process and we do agree with the objectors' argument that the titles are misleading as to that process.

#### (3)  Parental–Waiver Process

The crux of the objectors' claim is that the parental-waiver process is actually a sham, and since that is the only way by which bilingual education can still be taught, bilingual education is effectively dead.  The initiatives purport to allow bilingual education through operation of the waiver process, but then create hurdles that make it likely that only the fewest number of waivers will be granted: too few to require, or permit, bilingual education in the future.

Under the initiatives, the mechanics of the waiver process are as follows:

Except for students granted waivers under subsection (4), there will be no bilingual education courses.  Initiatives # 21 & # 22, subsec. (3).  Subsection (4) details the requirements for such a waiver: (1) schools may only grant waivers in three situations to children who already possess good English-language skills, to children who are at least ten years old, or to children with special physical or psychological needs, *over and above the child's lack of English proficiency,* subsec. (4)(b)(I)-(III); (2) parents (or legal guardians) must personally visit the school to apply for the waiver, where they will be provided with a full description of the educational options for their child, subsec. (4)(a); (3) the waiver process must be renewed every year, subsec. (4)(b)(III); (4) a waiver for special needs may only be applied for after the student has completed thirty instructional days; (5) any decision to grant a waiver is subject to the approval of the local school superintendent; and (6) the existence of special needs does not compel a waiver.

Subsection (5) then lists some of the legal consequences that public employees may encounter if they grant such a waiver:

Parents who apply for and are granted exception waivers under subparagraph (III) of paragraph (b) of subsection (4) of this section still retain for ten years thereafter the full legal right to sue the individuals who granted such waivers if they subsequently conclude during that period that the waivers were granted in error and ultimately injured the education of their child.

Subsection (4)(a) lastly states that: "Schools may refuse to approve any such waiver application at their sole discretion, without any need to indicate cause."

The titles describe the initiatives' waiver process as follows:

An amendment to the Colorado constitution ... establishing a parental waiver process to exempt from the English immersion program children who already know English, older children, and children with special needs; requiring schools in which at least twenty students in the same grade receive a waiver to offer classes teaching English and other subjects through bilingual education techniques or other generally recognized educational methodologies; ... allowing schools to deny a waiver without cause; allowing a parent or legal guardian to sue for enforcement of the measure and, if successful, to be awarded normal and customary attorney fees and actual and compensatory damages; creating personal liability for any school district employee or school board member who willfully and repeatedly refuses to implement the measure; prohibiting indemnification of any school district employee or school board member found liable; requiring immediate removal of such person from office and barring such person for five years from holding a position of authority within Colorado government or the public school system; allowing a parent or legal guardian to sue individuals who granted a waiver if the parent or legal guardian later concludes that the waiver was granted in error and injured the child's education. . . .

We are therefore presented with the situation where the titles do in fact contain many features of the initiatives' parental-waiver process, but nevertheless tend to overwhelm and obscure the inevitable outcome of the waiver process when all of the provisions are properly taken into account.

We were confronted with an analogous situation in *In re Proposed Initiative on "Obscenity"*, 877 P.2d 848 (Colo.1994). Even though the language of the titles set by the title board was nearly identical to that of the proposed initiative, the titles still did not fairly reflect the contents of the measure. *Id.* at 850. The titles failed to sufficiently inform voters that the measure was intended to prevent the state from adopting a definition of obscenity that was broader than that under the First Amendment. *Id.* at 850–51.

In the same way, the titles in this case create confusion and are misleading because they do not sufficiently inform the voters of the parental-waiver process and its virtual elimination of bilingual education as a viable parental and school district option. This is the same problem we identified in our prior case. *See In re Ballot Title 1999–2000 #258(A)*, 4 P.3d at 1100 (holding that the title of that initiative created confusion and was misleading in that "[v]oters could assume that parents of non-English speaking students will have a meaningful choice between an English immersion program and a bilingual program, and, thus, favor the proposal as assuring both programs."). Contrary to the title board's and proponents' position, we need not engage in the prediction of doubtful future effects to reach that conclusion. The amendment requires all public schools to place all children in English-language classrooms, and to place all English learners in a sheltered English immersion program for a temporary transition period until they are reasonably fluent in English and able to perform ordinary classroom work in English. The amendment defines English learners as children who are not reasonably fluent in English and not currently able to perform ordinary classroom work in English. The temporary transition period is not normally intended to exceed one year. Parents or legal guardians may seek

to exempt their children from the effect of this amendment only by seeking a waiver from the child's school. The school can only grant the waiver in very restrictive circumstances identified in the amendment and the school can deny the waiver for any reason or no reason. A parent or legal guardian may sue an individual granting a waiver if the parent or guardian later concludes that the waiver was granted in error and injured the child's education. While it is the proponents' right to advance such a measure, the titles must properly advise the voters of the operation of the measure.

■ The initiative process in Colorado has proliferated, and accordingly, this court and the title board now deal with an increasing number of measures. More importantly, when the proposals acquire the requisite support to be placed on the ballot, the voters now deal with an increasing number of measures. Particularly in this climate, we conclude that the fixing of an understandable title is of great importance. We recognize that fixing a title in cases like this, where the measure is both detailed and internally circuitous, is a difficult task. However, the title board must nonetheless proceed. We direct the board to begin the titles with a clear, general summary of the initiative, followed by a brief description of the major elements of the initiative. The titles, standing alone, should be capable of being read and understood, and capable of informing the voter of the major import of the proposal, but need *not* include every detail. They must allow the voter to understand the effect of a yes or no vote on the measure. When they do not, both the title board and this court fail in our respective functions.

### (4) Local Versus State Control

The objectors' final contention is that the titles are unfair because they do not clearly express that the intent of the initiatives is to remove English-language acquisition from local to state control. To a large extent, this argument is based on the objectors' assumption that the initiatives contain a broad new general right to education under the control of the state. We rejected this proposition in our discussion of the single-subject require-

ment. The titles cannot be misleading for failing to reference a constitutional duty that the measures do not contain.

### III.

Accordingly, we reverse the action of the title board in the setting of titles for Initiatives # 21 and # 22. We return the measures to the board for the purpose of fixing new titles.

### Appendix A—Proposed Initiative 2001–2002 # 21

Be it enacted by the People of the State of Colorado:

### SECTION 1.

**Article IX of the Constitution of the state of Colorado is amended BY THE ADDITION OF A NEW SECTION to read:**

**Section 18: English Language Education for Children in Public Schools.**

(1) **Findings and declarations.**

THE PEOPLE OF COLORADO FIND AND DECLARE THAT:

(a) THE ENGLISH LANGUAGE IS THE COMMON PUBLIC LANGUAGE OF THE UNITED STATES OF AMERICA AND OF THE STATE OF COLORADO. IT IS SPOKEN BY THE VAST MAJORITY OF COLORADO RESIDENTS, AND IS ALSO THE LEADING WORLD LANGUAGE FOR SCIENCE, TECHNOLOGY, AND INTERNATIONAL BUSINESS, THEREBY BEING THE LANGUAGE OF ECONOMIC OPPORTUNITY; AND

(b) IMMIGRANT PARENTS ARE EAGER TO HAVE THEIR CHILDREN ACQUIRE A GOOD KNOWLEDGE OF ENGLISH, THEREBY ALLOWING THEM TO FULLY PARTICIPATE IN THE AMERICAN DREAM OF ECONOMIC AND SOCIAL ADVANCEMENT; AND

(c) THE GOVERNMENT AND THE PUBLIC SCHOOLS OF COLORADO HAVE A MORAL OBLIGATION AND A CONSTITUTIONAL DUTY TO PROVIDE ALL OF COLORADO'S CHILDREN, REGARDLESS OF THEIR ETHNICITY OR NATIONAL ORIGINS, WITH AN AVAILABLE PUBLIC SCHOOL EDUCATION NECESSARY TO BECOME PRODUCTIVE MEMBERS OF OUR SOCIETY. FLUENCY AND LITERACY IN THE ENGLISH

LANGUAGE ARE AMONG THE MOST IMPORTANT PARTS OF SUCH AN EDUCATION; AND

(d) THE PUBLIC SCHOOLS OF COLORADO OFTEN DO AN INADEQUATE JOB OF EDUCATING IMMIGRANT CHILDREN, WASTING FINANCIAL RESOURCES ON COSTLY EXPERIMENTAL NATIVE LANGUAGE PROGRAMS WHOSE FAILURE OVER PAST DECADES IS DEMONSTRATED BY THE CURRENT HIGH DROP-OUT RATES AND LOW ENGLISH LITERACY LEVELS OF MANY IMMIGRANT CHILDREN; AND

(e) YOUNG IMMIGRANT CHILDREN CAN EASILY ACQUIRE FULL FLUENCY IN A NEW LANGUAGE, SUCH AS ENGLISH, IF THEY ARE HEAVILY EXPOSED TO THAT LANGUAGE IN THE CLASSROOM AT AN EARLY AGE; AND

(f) THEREFORE IT IS RESOLVED THAT: ALL CHILDREN IN COLORADO PUBLIC SCHOOLS SHALL BE TAUGHT ENGLISH AS RAPIDLY AND EFFECTIVELY AS POSSIBLE.

## (2) **Definitions.**

IN THIS SECTION,

(a) "BILINGUAL EDUCATION," ALSO KNOWN AS NATIVE LANGUAGE INSTRUCTION, MEANS A LANGUAGE ACQUISITION PROCESS FOR STUDENTS IN WHICH ALL OR SUBSTANTIAL PORTIONS OF THE INSTRUCTION, TEXTBOOKS, OR TEACHING MATERIALS ARE IN THE CHILD'S NATIVE LANGUAGE OTHER THAN ENGLISH.

(b) "ENGLISH LANGUAGE CLASSROOM" MEANS A CLASSROOM IN WHICH THE LANGUAGE OF INSTRUCTION USED BY THE TEACHING PERSONNEL IS OVERWHELMINGLY THE ENGLISH LANGUAGE, AND IN WHICH ALL SUCH TEACHING PERSONNEL ARE FLUENT AND LITERATE IN THE ENGLISH LANGUAGE. ENGLISH LANGUAGE CLASS ROOMS ENCOMPASS BOTH ENGLISH LANGUAGE MAINSTREAM CLASSROOMS AND SHELTERED ENGLISH IMMERSION CLASSROOMS.

(c) "ENGLISH LANGUAGE MAINSTREAM CLASSROOM" MEANS A STANDARD CLASSROOM, ONE IN WHICH THE STUDENTS EITHER ARE NATIVE ENGLISH LANGUAGE SPEAKERS OR ALREADY HAVE ACQUIRED REASONABLE FLUENCY IN ENGLISH.

(d) "ENGLISH LEARNER" MEANS A CHILD WHO IS NOT FLUENT IN ENGLISH AND WHO IS NOT CURRENTLY ABLE TO PERFORM ORDINARY CLASSROOM WORK IN ENGLISH.

(e) "SHELTERED ENGLISH IMMERSION" MEANS AN ENGLISH LANGUAGE ACQUISITION PROCESS FOR STUDENTS IN WHICH NEARLY ALL CLASSROOM INSTRUCTION IS IN ENGLISH BUT WITH THE CURRICULUM AND PRESENTATION DESIGNED FOR CHILDREN WHO ARE LEARNING THE LANGUAGE. BOOKS AND INSTRUCTIONAL MATERIALS ARE IN ENGLISH AND ALL READING, WRITING, AND SUBJECT MATTER ARE TAUGHT IN ENGLISH. ALTHOUGH TEACHING PERSONNEL MAY USE A MINIMAL AMOUNT OF THE CHILD'S NATIVE LANGUAGE WHEN NECESSARY, NO SUBJECT MATTER SHALL BE TAUGHT IN ANY LANGUAGE OTHER THAN ENGLISH, AND CHILDREN IN THIS PROGRAM LEARN TO READ AND WRITE SOLELY IN ENGLISH. OTHER ASPECTS OF THIS EDUCATIONAL METHODOLOGY SHALL FOLLOW THE STANDARD DEFINITION OF "SHELTERED ENGLISH" OR "STRUCTURED ENGLISH" FOUND IN STANDARD EDUCATIONAL LITERATURE.

## (3) **English language education.**

SUBJECT TO THE EXCEPTIONS PROVIDED IN SUBSECTION (4) OF THIS SECTION ALL CHILDREN IN COLORADO PUBLIC SCHOOLS SHALL BE TAUGHT ENGLISH BY BEING TAUGHT IN ENGLISH AND ALL CHILDREN SHALL BE PLACED IN ENGLISH LANGUAGE CLASSROOMS. CHILDREN WHO ARE ENGLISH LEARNERS SHALL BE EDUCATED THROUGH SHELTERED ENGLISH IMMERSION DURING A TEMPORARY TRANSITION PERIOD NOT NORMALLY INTENDED TO EXCEED ONE YEAR. PUBLIC SCHOOLS SHALL BE PERMITTED BUT NOT REQUIRED TO PLACE IN THE SAME CLASSROOM ENGLISH LEARNERS OF DIFFERENT AGES BUT WHOSE DEGREE OF ENGLISH PROFICIENCY IS SIMILAR. PUBLIC SCHOOLS SHALL BE ENCOURAGED TO MIX TOGETHER IN THE SAME CLASSROOM ENGLISH LEARNERS FROM DIFFERENT NATIVE-LANGUAGE GROUPS BUT WITH THE SAME DEGREE OF ENGLISH FLUENCY. ONCE ENGLISH LEARNERS HAVE ACQUIRED REASONABLE FLUENCY IN ENGLISH AND ARE ABLE TO PERFORM ORDINARY SCHOOL WORK IN ENGLISH, THEY SHALL NO LONGER BE CLASSIFIED AS ENGLISH LEARNERS AND SHALL BE

TRANSFERRED TO ENGLISH LANGUAGE MAINSTREAM CLASSROOMS. AS MUCH AS POSSIBLE, PER PUPIL SUPPLEMENTAL FUNDING FOR ENGLISH LEARNERS SHALL AT LEAST BE MAINTAINED. FOREIGN LANGUAGE CLASSES FOR CHILDREN WHO ARE NOT ENGLISH LEARNERS SHALL NOT BE AFFECTED, NOR SHALL SPECIAL EDUCATIONAL PROGRAMS FOR PHYSICALLY- OR MENTALLY-IMPAIRED STUDENTS BE AFFECTED.

### (4) Parental waivers.

(a) THE REQUIREMENTS OF SUBSECTION (3) OF THIS SECTION MAY BE WAIVED WITH THE PRIOR WRITTEN INFORMED CONSENT, TO BE PROVIDED ANNUALLY, OF THE CHILD'S PARENTS OR LEGAL GUARDIAN UNDER THE CIRCUMSTANCES SPECIFIED IN THIS SUBSECTION (4). SUCH INFORMED CONSENT SHALL REQUIRE THAT SAID PARENTS OR LEGAL GUARDIAN INITIATE THE WAIVER PROCESS AND PERSONALLY VISIT THE SCHOOL TO APPLY FOR THE WAIVER AND THAT THEY THERE BE PROVIDED A FULL DESCRIPTION IN A LANGUAGE THEY CAN UNDERSTAND OF THE EDUCATIONAL MATERIALS TO BE USED IN THE DIFFERENT EDUCATIONAL PROGRAM CHOICES AND ALL THE PUBLIC SCHOOL EDUCATIONAL OPPORTUNITIES AVAILABLE TO THE CHILD. IF A PARENTAL WAIVER HAS BEEN GRANTED, THE AFFECTED CHILD MAY BE TRANSFERRED TO CLASSES TEACHING ENGLISH AND OTHER SUBJECTS THROUGH BILINGUAL EDUCATION TECHNIQUES OR OTHER GENERALLY RECOGNIZED EDUCATIONAL METHODOLOGIES PERMITTED BY LAW. INDIVIDUAL SCHOOLS IN WHICH TWENTY STUDENTS OR MORE OF A GIVEN GRADE LEVEL RECEIVE A WAIVER SHALL BE REQUIRED TO OFFER SUCH A CLASS; IN ALL OTHER CASES, SUCH STUDENTS SHALL BE PERMITTED TO TRANSFER TO A PUBLIC SCHOOL IN WHICH SUCH CLASS IS OFFERED, WITH THE COSTS OF SUCH TRANSFER, EXCLUDING TRANSPORTATION, TO BE PROVIDED BY THE STATE. SCHOOLS MAY REFUSE TO APPROVE ANY SUCH WAIVER APPLICATION AT THEIR SOLE DISCRETION, WITHOUT ANY NEED TO INDICATE CAUSE.

(b) THE CIRCUMSTANCES IN WHICH A PARENTAL EXCEPTION WAIVER MAY BE APPLIED FOR UNDER THIS SECTION ARE AS FOLLOWS:

(I) CHILDREN WHO ALREADY KNOW ENGLISH: THE CHILD ALREADY POSSESSES GOOD ENGLISH LANGUAGE SKILLS, AS MEASURED BY ORAL EVALUATION OR STANDARDIZED TESTS OF ENGLISH VOCABULARY COMPREHENSION, READING, AND WRITING, IN WHICH THE CHILD SCORES APPROXIMATELY AT OR ABOVE THE STATE AVERAGE FOR HIS OR HER GRADE LEVEL OR AT OR ABOVE THE FIFTH GRADE AVERAGE, WHICHEVER IS LOWER; OR

(II) OLDER CHILDREN: THE CHILD IS AGE TEN YEARS OR OLDER, AND IT IS THE INFORMED BELIEF OF THE SCHOOL PRINCIPAL AND EDUCATIONAL STAFF THAT AN ALTERNATE COURSE OF EDUCATIONAL STUDY WOULD BE BETTER SUITED TO THE CHILD'S OVERALL EDUCATIONAL PROGRESS AND RAPID ACQUISITION OF BASIC ENGLISH LANGUAGE SKILLS; OR

(III) CHILDREN WITH SPECIAL INDIVIDUAL NEEDS: THE CHILD ALREADY HAS BEEN PLACED FOR A PERIOD OF NOT LESS THAN THIRTY CALENDAR DAYS [SIC] DURING THAT PARTICULAR SCHOOL YEAR IN AN ENGLISH LANGUAGE CLASSROOM AND IT IS SUBSEQUENTLY THE INFORMED BELIEF OF THE SCHOOL PRINCIPAL AND EDUCATIONAL STAFF THAT THE CHILD HAS SUCH SPECIAL AND INDIVIDUAL PHYSICAL OR PSYCHOLOGICAL NEEDS, ABOVE AND BEYOND THE CHILD'S LACK OF ENGLISH PROFICIENCY, THAT AN ALTERNATE COURSE OF EDUCATIONAL STUDY WOULD BE BETTER SUITED TO THE CHILD'S OVERALL EDUCATIONAL DEVELOPMENT AND RAPID ACQUISITION OF ENGLISH. A WRITTEN DESCRIPTION OF NO FEWER THAN TWO HUNDRED FIFTY WORDS DOCUMENTING THESE SPECIAL INDIVIDUAL NEEDS FOR THE SPECIFIC CHILD MUST BE PROVIDED AND PERMANENTLY ADDED TO THE CHILD'S OFFICIAL SCHOOL RECORDS, AND IN ORDER TO BE APPROVED THE WAIVER APPLICATION MUST CONTAIN THE ORIGINAL AUTHORIZING SIGNATURES OF BOTH THE SCHOOL PRINCIPAL AND THE LOCAL SCHOOL SUPERINTENDENT. WAIVERS GRANTED UNDER THIS SUBPARAGRAPH

CANNOT BE APPLIED FOR UNTIL AFTER THIRTY INSTRUCTIONAL DAYS [SIC] OF A GIVEN SCHOOL YEAR HAVE PASSED, AND THIS WAIVER PROCESS MUST BE RENEWED EACH AND EVERY SCHOOL YEAR. ANY SUCH DECISION TO ISSUE SUCH AN INDIVIDUAL WAIVER IS TO BE MADE SUBJECT TO THE EXAMINATION AND APPROVAL OF THE LOCAL SCHOOL SUPERINTENDENT, UNDER GUIDELINES ESTABLISHED BY AND SUBJECT TO THE REVIEW OF THE LOCAL BOARD OF EDUCATION. THE EXISTENCE OF SUCH SPECIAL INDIVIDUAL NEEDS SHALL NOT COMPEL ISSUANCE OF A WAIVER, AND THE PARENTS SHALL BE FULLY INFORMED OF THEIR OWN RIGHT TO REFUSE TO AGREE TO A WAIVER.

## (5) Legal standing and parental enforcement.

AS DETAILED IN SUBSECTIONS (3) AND (4) OF THIS SECTION, ALL COLORADO SCHOOL CHILDREN HAVE THE RIGHT TO BE PROVIDED AT THEIR PUBLIC SCHOOL OF CHOICE WITH AN ENGLISH LANGUAGE PUBLIC EDUCATION. THE PARENT OR LEGAL GUARDIAN OF ANY COLORADO SCHOOL CHILD SHALL HAVE LEGAL STANDING TO SUE FOR ENFORCEMENT OF THE PROVISIONS OF THIS SECTION, AND IF SUCCESSFUL SHALL BE AWARDED NORMAL AND CUSTOMARY ATTORNEY FEES AND ACTUAL AND COMPENSATORY DAMAGES, BUT NOT PUNITIVE OR CONSEQUENTIAL DAMAGES. ANY SCHOOL DISTRICT EMPLOYEE OR SCHOOL BOARD MEMBER WHO WILLFULLY AND REPEATEDLY REFUSES TO IMPLEMENT THE TERMS OF THIS SECTION MAY BE HELD PERSONALLY LIABLE FOR ATTORNEY FEES AND ACTUAL AND COMPENSATORY DAMAGES BY THE CHILD'S PARENTS OR LEGAL GUARDIAN, AND CANNOT BE SUBSEQUENTLY INDEMNIFIED FOR SUCH ASSESSED DAMAGES BY ANY PUBLIC OR PRIVATE THIRD PARTY. ANY INDIVIDUAL FOUND SO LIABLE IN A COURT OF LAW SHALL BE IMMEDIATELY REMOVED FROM OFFICE FOR MALFEASANCE, AND SHALL BE BARRED FROM HOLDING ANY POSITION OF AUTHORITY ANYWHERE WITHIN THE COLORADO GOVERNMENT OR THE PUBLIC SCHOOL SYSTEM FOR A SUBSEQUENT PERIOD OF FIVE YEARS. PARENTS WHO APPLY FOR AND ARE GRANTED EXCEPTION WAIVERS UNDER SUBPARAGRAPH

(III) OF PARAGRAPH (B) OF SUBSECTION (4) OF THIS SECTION STILL RETAIN FOR TEN YEARS THEREAFTER THE FULL LEGAL RIGHT TO SUE THE INDIVIDUALS WHO GRANTED SUCH WAIVERS IF THEY SUBSEQUENTLY CONCLUDE DURING THAT PERIOD THAT THE WAIVERS WERE GRANTED IN ERROR AND ULTIMATELY INJURED THE EDUCATION OF THEIR CHILD.

## (6) Standardized testing for monitoring education progress.

IN ORDER TO ENSURE THAT THE EDUCATIONAL PROGRESS OF COLORADO STUDENTS IN LEARNING ENGLISH TOGETHER WITH OTHER ACADEMIC SUBJECTS IS PROPERLY MONITORED, A STANDARDIZED, NATIONALLY-NORMED WRITTEN TEST OF ACADEMIC SUBJECT MATTER GIVEN IN ENGLISH SHALL BE ADMINISTERED AT LEAST ONCE EACH YEAR TO ALL COLORADO PUBLIC SCHOOLCHILDREN IN GRADES 2 AND HIGHER WHO ARE ENGLISH LEARNERS. ONLY STUDENTS CLASSIFIED AS SEVERELY LEARNING DISABLED MAY BE EXEMPTED FROM THIS TEST. THE PARTICULAR TEST TO BE USED SHALL BE SELECTED BY THE COLORADO COMMISSIONER OF EDUCATION, AND IT IS INTENDED THAT THE TEST SHALL GENERALLY REMAIN THE SAME FROM YEAR TO YEAR. THE NATIONAL PERCENTILE SCORES OF STUDENTS SHALL BE CONFIDENTIALLY PROVIDED TO INDIVIDUAL PARENTS, AND THE AGGREGATED PERCENTILE SCORES AND DISTRIBUTIONAL DATA FOR INDIVIDUAL SCHOOLS AND SCHOOL DISTRICTS SHALL BE MADE PUBLICLY AVAILABLE ON AN INTERNET WEB SITE; THE SCORES FOR STUDENTS CLASSIFIED AS ENGLISH LEARNERS SHALL BE SEPARATELY SUB-AGGREGATED AND MADE PUBLICLY AVAILABLE THERE AS WELL, WITH FURTHER SUB-AGGREGATION BASED ON THE ENGLISH LEARNER PROGRAM TYPE IN WHICH STUDENTS ARE ENROLLED. SCORES OF STUDENTS WHO ARE NEITHER EXEMPTED NOR TAKE THE TEST SHALL BE REPORTED AS ZERO. ALTHOUGH ADMINISTRATION OF THIS TEST IS REQUIRED SOLELY FOR MONITORING EDUCATIONAL PROGRESS, COLORADO PUBLIC OFFICIALS AND ADMINISTRATORS MAY UTILIZE THESE TEST SCORES FOR OTHER PURPOSES AS WELL IF THEY SO CHOOSE.

## (7) Severability.

IF A PROVISION OF THIS SECTION OR ITS APPLICATION TO ANY PERSON OR CIRCUMSTANCES IS

HELD INVALID, THE INVALIDITY DOES NOT AFFECT OTHER PROVISIONS OR APPLICATIONS OF THIS SECTION THAT CAN BE GIVEN EFFECT WITHOUT THE INVALID PROVISION OR APPLICATION, AND TO THIS END THE PROVISIONS OF THIS SECTION ARE SEVERABLE.

### (8) Interpretation.

UNDER CIRCUMSTANCES IN WHICH PORTIONS OF THIS STATUTE [SIC] ARE SUBJECT TO CONFLICTING INTERPRETATIONS, THE FINDINGS AND DECLARATIONS OF SUBSECTION (1) OF THIS SECTION SHALL BE ASSUMED TO CONTAIN THE GOVERNING INTENT OF THE SECTION.

### SECTION 2. Effective date—applicability.

This initiative shall take effect upon proclamation of the vote by the Governor, and shall apply to all school terms beginning more than sixty days after such date.

### Appendix B

### *Ballot Title Setting Board*

### Proposed Initiative Number 2001–2002 # 21[1]

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado constitution concerning English language education for children in public schools, and, in connection therewith, requiring all children in Colorado public schools to be taught English by being taught in English and all children to be placed in English-language classrooms, except those who obtain a waiver; establishing an English immersion program to educate children who are English learners during a temporary transition period not normally intended to exceed one year; requiring the transfer of English learners to an English mainstream classroom when they are reasonably fluent in English and able to perform ordinary school work in English; specifying the amendment shall not affect foreign language classes for children who are not English learners nor special educational programs for physically- or mentally-impaired students; maintaining, if possible, existing per pupil supplemental funding for English learners as minimum funding; establishing a parental waiver process to exempt from the English immersion program children who already know English, older children, and children with special needs; requiring schools in which at least twenty students in the same grade receive a waiver to offer classes teaching English and other subjects through bilingual education techniques or other generally recognized educational methodologies; requiring the costs of student transfers under the measure, excluding transportation costs, to be paid by the state, allowing schools to deny a waiver without cause; allowing a parent or legal guardian to sue for enforcement of the measure and, if successful, to be awarded normal and customary attorney fees and actual and compensatory damages; creating personal liability for any school district employee or school board member who willfully and repeatedly refuses to implement the measure; prohibiting indemnification of any school district employee or school board member found liable; requiring immediate removal of such person from office and barring such person for five years from holding a position of authority within Colorado government or the public school system; allowing a parent or legal guardian to sue individuals who granted a waiver if the parent or legal guardian later concludes that the waiver was granted in error and injured the child's education; and requiring schools at least annually to test all English learners, enrolled in second grade or higher, except those who are severely learning disabled, using a standardized, nationally-normed written test of academic subject matter given in English and including standards for grading of tests.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado constitution concerning English language education for children in public schools, and, in connection therewith, requir-

---

1. Unofficially captioned "**English Language Education**" by legislative staff for tracking purposes.

Such caption is not part of the titles set by the Board.

ing all children in Colorado public schools to be taught English by being taught in English and all children to be placed in English-language classrooms, except those who obtain a waiver; establishing an English immersion program to educate children who are English learners during a temporary transition period not normally intended to exceed one year; requiring the transfer of English learners to an English mainstream classroom when they are reasonably fluent in English and able to perform ordinary school work in English; specifying the amendment shall not affect foreign language classes for children who are not English learners nor special educational programs for physically- or mentally-impaired students; maintaining, if possible, existing per pupil supplemental funding for English learners as minimum funding; establishing a parental waiver process to exempt from the English immersion program children who already know English, older children, and children with special needs; requiring schools in which at least twenty students in the same grade receive a waiver to offer classes teaching English and other subjects through bilingual education techniques or other generally recognized educational methodologies; requiring the costs of student transfers under the measure, excluding transportation costs, to be paid by the state, allowing schools to deny a waiver without cause; allowing a parent or legal guardian to sue for enforcement of the measure and, if successful, to be awarded normal and customary attorney fees and actual and compensatory damages; creating personal liability for any school district employee or school board member who willfully and repeatedly refuses to implement the measure; prohibiting indemnification of any school district employee or school board member found liable; requiring immediate removal of such person from office and barring such person for five years from holding a position of authority within Colorado government or the public school system; allowing a parent or legal guardian to sue individuals who granted a waiver if the parent or legal guardian later concludes that the waiver was granted in error and injured the child's education; and requiring schools at least annually to test all English learners, enrolled in second grade or higher, except those who are severely learning disabled, using a standardized, nationally-normed written test of academic subject matter given in English and including standards for grading of tests?

*Hearing December 5, 2001:*

*Single subject approved; staff draft amended; titles set.*

*Hearing adjourned 3:44 p.m.*

### Appendix C—Proposed Initiative 2001–2002 # 22

Be it enacted by the People of the State of Colorado:

## SECTION 1.

**Article IX of the Constitution of the state of Colorado is amended BY THE ADDITION OF A NEW SECTION to read:**

**Section 18: English Language Education for Children in Public Schools.**

(1) **Findings and declarations.**

THE PEOPLE OF COLORADO FIND AND DECLARE THAT:

(a) THE ENGLISH LANGUAGE IS THE COMMON PUBLIC LANGUAGE OF THE UNITED STATES OF AMERICA AND OF THE STATE OF COLORADO. IT IS SPOKEN BY THE VAST MAJORITY OF COLORADO RESIDENTS, AND IS ALSO THE LEADING WORLD LANGUAGE FOR SCIENCE, TECHNOLOGY, AND INTERNATIONAL BUSINESS, THEREBY BEING THE LANGUAGE OF ECONOMIC OPPORTUNITY; AND

(b) IMMIGRANT PARENTS ARE EAGER TO HAVE THEIR CHILDREN ACQUIRE A GOOD KNOWLEDGE OF ENGLISH, THEREBY ALLOWING THEM TO FULLY PARTICIPATE IN THE AMERICAN DREAM OF ECONOMIC AND SOCIAL ADVANCEMENT; AND

(c) THE GOVERNMENT AND THE PUBLIC SCHOOLS OF COLORADO HAVE A MORAL OBLIGATION AND A CONSTITUTIONAL DUTY TO PROVIDE ALL OF COLORADO'S CHILDREN, REGARDLESS OF THEIR ETHNICITY OR NATIONAL ORIGINS, WITH AN AVAILABLE PUBLIC SCHOOL EDUCATION NECESSARY TO BECOME PRODUCTIVE MEMBERS OF OUR SOCIETY. FLUENCY AND LITERACY IN THE ENGLISH

LANGUAGE ARE AMONG THE MOST IMPORTANT PARTS OF SUCH AN EDUCATION; AND

(d) THE PUBLIC SCHOOLS OF COLORADO OFTEN DO AN INADEQUATE JOB OF EDUCATING IMMIGRANT CHILDREN, WASTING FINANCIAL RESOURCES ON COSTLY EXPERIMENTAL NATIVE LANGUAGE PROGRAMS WHOSE FAILURE OVER PAST DECADES IS DEMONSTRATED BY THE CURRENT HIGH DROP-OUT RATES AND LOW ENGLISH LITERACY LEVELS OF MANY IMMIGRANT CHILDREN; AND

(e) YOUNG IMMIGRANT CHILDREN CAN EASILY ACQUIRE FULL FLUENCY IN A NEW LANGUAGE, SUCH AS ENGLISH, IF THEY ARE HEAVILY EXPOSED TO THAT LANGUAGE IN THE CLASSROOM AT AN EARLY AGE; AND

(f) THEREFORE IT IS RESOLVED THAT: ALL CHILDREN IN COLORADO PUBLIC SCHOOLS SHALL BE TAUGHT ENGLISH AS RAPIDLY AND EFFECTIVELY AS POSSIBLE.

## (2) Definitions.

IN THIS SECTION,

(a) "BILINGUAL EDUCATION," ALSO KNOWN AS NATIVE LANGUAGE INSTRUCTION, MEANS A LANGUAGE ACQUISITION PROCESS FOR STUDENTS IN WHICH ALL OR SUBSTANTIAL PORTIONS OF THE INSTRUCTION, TEXTBOOKS, OR TEACHING MATERIALS ARE IN THE CHILD'S NATIVE LANGUAGE OTHER THAN ENGLISH.

(b) "ENGLISH LANGUAGE CLASSROOM" MEANS A CLASSROOM IN WHICH THE LANGUAGE OF INSTRUCTION USED BY THE TEACHING PERSONNEL IS OVERWHELMINGLY THE ENGLISH LANGUAGE, AND IN WHICH ALL SUCH TEACHING PERSONNEL ARE FLUENT AND LITERATE IN ENGLISH LANGUAGE. ENGLISH LANGUAGE CLASS ROOMS ENCOMPASS BOTH "ENGLISH LANGUAGE MAINSTREAM CLASSROOMS AND SHELTERED ENGLISH IMMERSION CLASSROOMS.

(c) "ENGLISH LANGUAGE MAINSTREAM CLASSROOM" MEANS A STANDARD CLASSROOM, ONE IN WHICH THE STUDENTS EITHER ARE NATIVE ENGLISH LANGUAGE SPEAKERS OR ALREADY HAVE ACQUIRED REASONABLY FLUENCY IN ENGLISH.

(d) "ENGLISH LEARNER" MEANS A CHILD WHO IS NOT FLUENT IN ENGLISH AND WHO IS NOT CURRENTLY ABLE TO PERFORM ORDINARY CLASSROOM WORK IN ENGLISH.

(e) "SHELTERED ENGLISH IMMERSION" MEANS AN ENGLISH LANGUAGE ACQUISITION PROCESS FOR STUDENTS IN WHICH NEARLY ALL CLASSROOM INSTRUCTION IS IN ENGLISH BUT WITH THE CURRICULUM AND PRESENTATION DESIGNED FOR CHILDREN WHO ARE LEARNING THE LANGUAGE. BOOKS AND INSTRUCTIONAL MATERIALS ARE IN ENGLISH AND ALL READING, WRITING, AND SUBJECT MATTER ARE TAUGHT IN ENGLISH. ALTHOUGH TEACHING PERSONNEL MAY USE A MINIMAL AMOUNT OF THE CHILD'S NATIVE LANGUAGE WHEN NECESSARY, NO SUBJECT MATTER SHALL BE TAUGHT IN ANY LANGUAGE OTHER THAN ENGLISH, AND CHILDREN IN THIS PROGRAM LEARN TO READ AND WRITE SOLELY IN ENGLISH. OTHER ASPECTS OF THIS EDUCATIONAL METHODOLOGY SHALL FOLLOW THE STANDARD DEFINITION OF "SHELTERED ENGLISH" OR "STRUCTURED ENGLISH" FOUND IN STANDARD EDUCATIONAL LITERATURE.

## (3) English language education.

SUBJECT TO THE EXCEPTIONS PROVIDED IN SUBSECTION (4) OF THIS SECTION ALL CHILDREN IN COLORADO PUBLIC SCHOOLS SHALL BE TAUGHT ENGLISH BY BEING TAUGHT IN ENGLISH AND ALL CHILDREN SHALL BE PLACED IN ENGLISH LANGUAGE CLASSROOMS. CHILDREN WHO ARE ENGLISH LEARNERS SHALL BE EDUCATED THROUGH SHELTERED ENGLISH IMMERSION DURING A TEMPORARY TRANSITION PERIOD NOT NORMALLY INTENDED TO EXCEED ONE YEAR. PUBLIC SCHOOLS SHALL BE PERMITTED BUT NOT REQUIRED TO PLACE IN THE SAME CLASSROOM ENGLISH LEARNERS OF DIFFERENT AGES BUT WHOSE DEGREE OF ENGLISH PROFICIENCY IS SIMILAR. PUBLIC SCHOOLS SHALL BE ENCOURAGED TO MIX TOGETHER IN THE SAME CLASSROOM ENGLISH LEARNERS FROM DIFFERENT NATIVE-LANGUAGE GROUPS BUT WITH THE SAME DEGREE OF ENGLISH FLUENCY. ONCE ENGLISH LEARNERS HAVE ACQUIRED REASONABLE FLUENCY IN ENGLISH AND ARE ABLE TO PERFORM ORDINARY SCHOOL WORK IN ENGLISH, THEY SHALL NO LONGER BE CLASSIFIED AS ENGLISH LEARNERS AND SHALL BE TRANSFERRED TO ENGLISH LANGUAGE MAINSTREAM CLASSROOMS. AS MUCH AS POSSI-

BLE, PER PUPIL SUPPLEMENTAL FUNDING FOR ENGLISH LEARNERS SHALL AT LEAST BE MAINTAINED. FOREIGN LANGUAGE CLASSES FOR CHILDREN WHO ARE NOT ENGLISH LEARNERS SHALL NOT BE AFFECTED, NOR SHALL SPECIAL EDUCATIONAL PROGRAMS FOR PHYSICALLY- OR MENTALLY-IMPAIRED STUDENTS BE AFFECTED.

### (4) Parental waivers.

(a) THE REQUIREMENTS OF SUBSECTION (3) OF THIS SECTION MAY BE WAIVED WITH THE PRIOR WRITTEN INFORMED CONSENT, TO BE PROVIDED ANNUALLY, OF THE CHILD'S PARENTS OR LEGAL GUARDIAN UNDER THE CIRCUMSTANCES SPECIFIED IN THIS SUBSECTION (4). SUCH INFORMED CONSENT SHALL REQUIRE THAT SAID PARENTS OR LEGAL GUARDIAN INITIATE THE WAIVER PROCESS AND PERSONALLY VISIT THE SCHOOL TO APPLY FOR THE WAIVER AND THAT THEY THERE BE PROVIDED A FULL DESCRIPTION IN A LANGUAGE THEY CAN UNDERSTAND OF THE EDUCATIONAL MATERIALS TO BE USED IN THE DIFFERENT EDUCATIONAL PROGRAM CHOICES AND ALL THE PUBLIC SCHOOL EDUCATIONAL OPPORTUNITIES AVAILABLE TO THE CHILD. IF A PARENTAL WAIVER HAS BEEN GRANTED, THE AFFECTED CHILD MAY BE TRANSFERRED TO CLASSES TEACHING ENGLISH AND OTHER SUBJECTS THROUGH BILINGUAL EDUCATION TECHNIQUES OR OTHER GENERALLY RECOGNIZED EDUCATIONAL METHODOLOGIES PERMITTED BY LAW. INDIVIDUAL SCHOOLS IN WHICH TWENTY STUDENTS OR MORE OF A GIVEN GRADE LEVEL RECEIVE A WAIVER SHALL BE REQUIRED TO OFFER SUCH A CLASS; IN ALL OTHER CASES, SUCH STUDENTS SHALL BE PERMITTED TO TRANSFER TO A PUBLIC SCHOOL IN WHICH SUCH CLASS IS OFFERED, WITH THE COSTS OF SUCH TRANSFER, EXCLUDING TRANSPORTATION, TO BE PROVIDED BY THE STATE. SCHOOLS MAY REFUSE TO APPROVE ANY SUCH WAIVER APPLICATION AT THEIR SOLE DISCRETION, WITHOUT ANY NEED TO INDICATE CAUSE.

(b) THE CIRCUMSTANCES IN WHICH A PARENTAL EXCEPTION WAIVER MAY BE APPLIED FOR UNDER THIS SECTION ARE AS FOLLOWS:

(I) CHILDREN WHO ALREADY KNOW ENGLISH: THE CHILD ALREADY POSSESSES GOOD ENGLISH LANGUAGE SKILLS, AS MEASURED BY ORAL EVALUATION OR STANDARDIZED TESTS OF ENGLISH VOCABULARY COMPREHENSION, READING, AND WRITING, IN WHICH THE CHILD SCORES APPROXIMATELY AT OR ABOVE THE STATE AVERAGE FOR HIS OR HER GRADE LEVEL OR AT OR ABOVE THE FIFTH GRADE AVERAGE, WHICHEVER IS LOWER; OR

(II) OLDER CHILDREN: THE CHILD IS AGE TEN YEARS OR OLDER, AND IT IS THE INFORMED BELIEF OF THE SCHOOL PRINCIPAL AND EDUCATIONAL STAFF THAT AN ALTERNATE COURSE OF EDUCATIONAL STUDY WOULD BE BETTER SUITED TO THE CHILD'S OVERALL EDUCATIONAL PROGRESS AND RAPID ACQUISITION OF BASIC ENGLISH LANGUAGE SKILLS; OR

(III) CHILDREN WITH SPECIAL INDIVIDUAL NEEDS: THE CHILD ALREADY HAS BEEN PLACED FOR A PERIOD OF NOT LESS THAN THIRTY CALENDAR DAYS [SIC] DURING THAT PARTICULAR SCHOOL YEAR IN AN ENGLISH LANGUAGE CLASSROOM AND IT IS SUBSEQUENTLY THE INFORMED BELIEF OF THE SCHOOL PRINCIPAL AND EDUCATIONAL STAFF THAT THE CHILD HAS SUCH SPECIAL AND INDIVIDUAL PHYSICAL OR PSYCHOLOGICAL NEEDS, ABOVE AND BEYOND THE CHILD'S LACK OF ENGLISH PROFICIENCY, THAT AN ALTERNATE COURSE OF EDUCATIONAL STUDY WOULD BE BETTER SUITED TO THE CHILD'S OVERALL EDUCATIONAL DEVELOPMENT AND RAPID ACQUISITION OF ENGLISH. A WRITTEN DESCRIPTION OF NO FEWER THAN TWO HUNDRED FIFTY WORDS DOCUMENTING THESE SPECIAL INDIVIDUAL NEEDS FOR THE SPECIFIC CHILD MUST BE PROVIDED AND PERMANENTLY ADDED TO THE CHILD'S OFFICIAL SCHOOL RECORDS, AND IN ORDER TO BE APPROVED THE WAIVER APPLICATION MUST CONTAIN THE ORIGINAL AUTHORIZING SIGNATURES OF BOTH THE SCHOOL PRINCIPAL AND THE LOCAL SCHOOL SUPERINTENDENT. WAIVERS GRANTED UNDER THIS SUBPARAGRAPH CANNOT BE APPLIED FOR UNTIL AFTER THIRTY INSTRUCTIONAL DAYS [SIC] OF A GIVEN SCHOOL YEAR HAVE PASSED, AND

THIS WAIVER PROCESS MUST BE RENEWED EACH AND EVERY SCHOOL YEAR. ANY SUCH DECISION TO ISSUE SUCH AN INDIVIDUAL WAIVER IS TO BE MADE SUBJECT TO THE EXAMINATION AND APPROVAL OF THE LOCAL SCHOOL SUPERINTENDENT, UNDER GUIDELINES ESTABLISHED BY AND SUBJECT TO THE REVIEW OF THE LOCAL BOARD OF EDUCATION. THE EXISTENCE OF SUCH SPECIAL INDIVIDUAL NEEDS SHALL NOT COMPEL ISSUANCE OF A WAIVER, AND THE PARENTS SHALL BE FULLY INFORMED OF THEIR OWN RIGHT TO REFUSE TO AGREE TO A WAIVER.

### (5) Legal standing and parental enforcement.

AS DETAILED IN SUBSECTIONS (3) AND (4) OF THIS SECTION, ALL COLORADO SCHOOL CHILDREN HAVE THE RIGHT TO BE PROVIDED AT THEIR PUBLIC SCHOOL OF CHOICE WITH AN ENGLISH LANGUAGE PUBLIC EDUCATION. THE PARENT OR LEGAL GUARDIAN OF ANY COLORADO SCHOOL CHILD SHALL HAVE LEGAL STANDING TO SUE FOR ENFORCEMENT OF THE PROVISIONS OF THIS SECTION, AND IF SUCCESSFUL SHALL BE AWARDED NORMAL AND CUSTOMARY ATTORNEY FEES AND ACTUAL AND COMPENSATORY DAMAGES, BUT NOT PUNITIVE OR CONSEQUENTIAL DAMAGES. ANY SCHOOL DISTRICT EMPLOYEE OR SCHOOL BOARD MEMBER WHO WILLFULLY AND REPEATEDLY REFUSES TO IMPLEMENT THE TERMS OF THIS SECTION MAY BE HELD PERSONALLY LIABLE FOR ATTORNEY FEES AND ACTUAL AND COMPENSATORY DAMAGES BY THE CHILD'S PARENTS OR LEGAL GUARDIAN, AND CANNOT BE SUBSEQUENTLY INDEMNIFIED FOR SUCH ASSESSED DAMAGES BY ANY PUBLIC OR PRIVATE THIRD PARTY. ANY INDIVIDUAL FOUND SO LIABLE IN A COURT OF LAW SHALL BE IMMEDIATELY REMOVED FROM OFFICE FOR MALFEASANCE, AND SHALL BE BARRED FROM HOLDING ANY POSITION OF AUTHORITY ANYWHERE WITHIN THE COLORADO GOVERNMENT OR THE PUBLIC SCHOOL SYSTEM FOR A SUBSEQUENT PERIOD OF FIVE YEARS. PARENTS WHO APPLY FOR AND ARE GRANTED EXCEPTION WAIVERS UNDER SUBPARAGRAPH (III) OF PARAGRAPH (B) OF SUBSECTION (4) OF THIS SECTION STILL RETAIN FOR TEN YEARS THEREAFTER THE FULL LEGAL RIGHT TO SUE THE INDIVIDUALS WHO GRANTED SUCH WAIVERS IF THEY SUBSEQUENTLY CONCLUDE DURING THAT PERIOD THAT THE WAIVERS WERE GRANTED IN ERROR AND ULTIMATELY INJURED THE EDUCATION OF THEIR CHILD.

### (6) Standardized testing for monitoring education progress.

IN ORDER TO ENSURE THAT THE EDUCATIONAL PROGRESS OF COLORADO STUDENTS IN LEARNING ENGLISH TOGETHER WITH OTHER ACADEMIC SUBJECTS IS PROPERLY MONITORED, A STANDARDIZED, NATIONALLY-NORMED WRITTEN TEST OF ACADEMIC SUBJECT MATTER GIVEN IN ENGLISH SHALL BE ADMINISTERED AT LEAST ONCE EACH YEAR TO ALL COLORADO PUBLIC SCHOOLCHILDREN IN GRADES 2 AND HIGHER WHO ARE ENGLISH LEARNERS. ONLY STUDENTS CLASSIFIED AS SEVERELY LEARNING DISABLED MAY BE EXEMPTED FROM THIS TEST. THE PARTICULAR TEST TO BE USED SHALL BE SELECTED BY THE COLORADO COMMISSIONER OF EDUCATION, AND IT IS INTENDED THAT THE TEST SHALL GENERALLY REMAIN THE SAME FROM YEAR TO YEAR. THE NATIONAL PERCENTILE SCORES OF STUDENTS SHALL BE CONFIDENTIALLY PROVIDED TO INDIVIDUAL PARENTS, AND THE AGGREGATED PERCENTILE SCORES AND DISTRIBUTIONAL DATA FOR INDIVIDUAL SCHOOLS AND SCHOOL DISTRICTS SHALL BE MADE PUBLICLY AVAILABLE ON AN INTERNET WEB SITE; THE SCORES FOR STUDENTS CLASSIFIED AS ENGLISH LEARNERS SHALL BE SEPARATELY SUB-AGGREGATED AND MADE PUBLICLY AVAILABLE THERE AS WELL, WITH FURTHER SUB-AGGREGATION BASED ON THE ENGLISH LEARNER PROGRAM TYPE IN WHICH STUDENTS ARE ENROLLED. SCORES OF STUDENTS WHO ARE NEITHER EXEMPTED NOR TAKE THE TEST SHALL BE REPORTED AS ZERO. ALTHOUGH ADMINISTRATION OF THIS TEST IS REQUIRED SOLELY FOR MONITORING EDUCATIONAL PROGRESS, COLORADO PUBLIC OFFICIALS AND ADMINISTRATORS MAY UTILIZE THESE TEST SCORES FOR OTHER PURPOSES AS WELL IF THEY SO CHOOSE.

### (7) Community-based English tutoring.

IN FURTHERANCE OF ITS CONSTITUTIONAL AND LEGAL REQUIREMENT TO OFFER SPECIAL LANGUAGE ASSISTANCE TO CHILDREN WHO ARE ENGLISH LEARNERS AND EFFECTIVELY IMPLEMENT THIS SECTION, THE STATE SHALL EN-

COURAGE FAMILY MEMBERS AND OTHERS TO PROVIDE PERSONAL ENGLISH LANGUAGE TUTORING TO SUCH CHILDREN, AND SUPPORT THESE EFFORTS BY RAISING THE GENERAL LEVEL OF ENGLISH LANGUAGE KNOWLEDGE IN THE COMMUNITY. COMMENCING WITH THE FISCAL YEAR IN WHICH THIS SECTION IS ENACTED AND FOR EACH OF THE NINE FISCAL YEARS FOLLOWING THEREAFTER, A SUM OF FIVE MILLION DOLLARS ($5,000,000) PER YEAR IS HEREBY APPROPRIATED FROM THE GENERAL FUND FOR THE PURPOSE OF PROVIDING ADDITIONAL FUNDING FOR FREE OR SUBSIDIZED PROGRAMS OF ADULT ENGLISH LANGUAGE INSTRUCTION TO PARENTS OR OTHER MEMBERS OF THE COMMUNITY WHO PLEDGE TO PROVIDE PERSONAL ENGLISH LANGUAGE TUTORING TO COLORADO SCHOOL CHILDREN WHO ARE ENGLISH LEARNERS. PROGRAMS FUNDED PURSUANT TO THIS SUBSECTION (7) SHALL BE PROVIDED THROUGH SCHOOLS OR COMMUNITY ORGANIZATIONS. FUNDING FOR THESE PROGRAMS SHALL BE ADMINISTERED BY THE COMMISSIONER OF EDUCATION, AND SHALL BE DISBURSED AT THE DISCRETION OF THE LOCAL SCHOOL BOARDS IN EACH DISTRICT, UNDER REASONABLE GUIDELINES ESTABLISHED BY, AND SUBJECT TO THE REVIEW OF, THE STATE BOARD OF EDUCATION. ANY SUCH FUNDS THAT ARE NOT DISBURSED ACCORDING TO THIS SUBSECTION (7), SHALL BE RETURNED TO THE GENERAL FUND AT THE END OF EACH FISCAL YEAR.

(8) **Severability.**

IF A PROVISION OF THIS SECTION OR ITS APPLICATION TO ANY PERSON OR CIRCUMSTANCES IS HELD INVALID, THE INVALIDITY DOES NOT AFFECT OTHER PROVISIONS OR APPLICATIONS OF THIS SECTION THAT CAN BE GIVEN EFFECT WITHOUT THE INVALID PROVISION OR APPLICATION, AND TO THIS END THE PROVISIONS OF THIS SECTION ARE SEVERABLE.

(9) **Interpretation.**

UNDER CIRCUMSTANCES IN WHICH PORTIONS OF THIS STATUTE [SIC] ARE SUBJECT TO CONFLICTING INTERPRETATIONS, THE FINDINGS AND DECLARATIONS OF SUBSECTION (1) OF THIS SECTION SHALL BE ASSUMED TO CONTAIN THE GOVERNING INTENT OF THE SECTION.

1. Unofficially captioned "**English Language Education**" by legislative staff for tracking purposes.

**SECTION 2. Effective date—applicability.**

This initiative shall take effect upon proclamation of the vote by the Governor, and shall apply to all school terms beginning more than sixty days after such date.

### Appendix D

### *Ballot Title Setting Board*

### Proposed Initiative Number 2001–2002 # 22[1]

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado constitution concerning English language education for children in public schools, and, in connection therewith, requiring all children in Colorado public schools to be taught English by being taught in English and all children to be placed in English-language classrooms, except those who obtain a waiver; establishing an English immersion program to educate children who are English learners during a temporary transition period not normally intended to exceed one year; requiring the transfer of English learners to an English mainstream classroom when they are reasonably fluent in English and able to perform ordinary school work in English; specifying the amendment shall not affect foreign language classes for children who are not English learners nor special educational programs for physically- or mentally-impaired students; maintaining, if possible, existing per pupil supplemental funding for English learners as minimum funding; establishing a parental waiver process to exempt from the English immersion program children who already know English, older children, and children with special needs; requiring schools in which at least twenty students in the same grade receive a waiver to offer classes teaching English and other subjects through bilingual education techniques or other generally recognized educational methodologies; requiring the costs of student transfers under the measure, excluding transportation costs, to be paid by the state, allowing schools to deny a waiver without cause; allowing a parent or legal guardian to sue for enforcement of the measure and, if successful, to be

Such caption is not part of the titles set by the Board.

awarded normal and customary attorney fees and actual and compensatory damages; creating personal liability for any school district employee or school board member who willfully and repeatedly refuses to implement the measure; prohibiting indemnification of any school district employee or school board member found liable; requiring immediate removal of such person from office and barring such person for five years from holding a position of authority within Colorado government or the public school system; allowing a parent or legal guardian to sue individuals who granted a waiver if the parent or legal guardian later concludes that the waiver was granted in error and injured the child's education; and requiring schools at least annually to test all English learners, enrolled in second grade or higher, except those who are severely learning disabled, using a standardized, nationally-normed written test of academic subject matter given in English; and including standards for grading of tests; requiring an annual appropriation of $5,000,000 from the general fund for a period of ten years to provide funding for adult English language instruction programs for parents or other members of the community who pledge to provide personal English language tutoring to Colorado school children who are English learners; and directing the state board of education to establish guidelines by which school district boards of education shall disburse said funds.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado constitution concerning English language education for children in public schools, and, in connection therewith, requiring all children in Colorado public schools to be taught English by being taught in English and all children to be placed in English-language classrooms, except those who obtain a waiver; establishing an English immersion program to educate children who are English learners during a temporary transition period not normally intended to exceed one year; requiring the transfer of English learners to an English mainstream classroom when they are reasonably fluent in English and able to perform ordinary school work in English; specifying the amendment shall not affect foreign language classes for children who are not English learners nor special educational programs for physically- or mentally-impaired students; maintaining, if possible, existing per pupil supplemental funding for English learners as minimum funding; establishing a parental waiver process to exempt from the English immersion program children who already know English, older children, and children with special needs; requiring schools in which at least twenty students in the same grade receive a waiver to offer classes teaching English and other subjects through bilingual education techniques or other generally recognized educational methodologies; requiring the costs of student transfers under the measure, excluding transportation costs, to be paid by the state, allowing schools to deny a waiver without cause; allowing a parent or legal guardian to sue for enforcement of the measure and, if successful, to be awarded normal and customary attorney fees and actual and compensatory damages; creating personal liability for any school district employee or school board member who willfully and repeatedly refuses to implement the measure; prohibiting indemnification of any school district employee or school board member found liable; requiring immediate removal of such person from office and barring such person for five years from holding a position of authority within Colorado government or the public school system; allowing a parent or legal guardian to sue individuals who granted a waiver if the parent or legal guardian later concludes that the waiver was granted in error and injured the child's education; and requiring schools at least annually to test all English learners, enrolled in second grade or higher, except those who are severely learning disabled, using a standardized, nationally-normed written test of academic subject matter given in English; and including standards for grading of tests; requiring an annual appropriation of $5,000,000 from the general fund for a period of ten years to provide funding for adult English language instruction programs for parents or other members of the community who pledge to

provide personal English language tutoring to Colorado school children who are English learners; and directing the state board of education to establish guidelines by which school district boards of education shall disburse said funds?

*Hearing December 5, 2001:*

*Single subject approved; staff draft amended; titles set.*

*Hearing adjourned 3:44 p.m.*

*Hearing December 19, 2001:*

*Motion for rehearing denied.*

*Hearing adjourned 4:31 p.m.*